## N. C. Harris et al., Plffs. in Err., *v.* Pennsylvania & New York Canal & Railroad Company.

Under the acts of February 25, 1826, and April 9, 1827, the board of canal commissioners had power to purchase lands through which the Pennsylvania canal was intended to pass, without limitation either as to amount or quality.

Land so purchased became *ipso facto* canal land and appurtenant to the canal.

Under the act of April 9, 1827, the board received authority to sell the remainder not occupied by the canal; but whether they should make such sale or not was left entirely to their own discretion.

Land so purchased and not sold by the board, although only partially occupied by the canal, passed by a sale under the act of April 21, 1858, of that portion of the canal "with all the property thereto belonging or in any wise appertaining," and proclamation and deed in accordance with the act.

(Argued March 15, 1887. Decided April 25, 1887.)

January Term, 1886, No. 219, E. D., before MERCUR, Ch. J., GORDON, PAXSON, TRUNKEY, STERRETT, GREEN, and CLARK, JJ. Error to the Common Pleas of Bradford County to review a judgment on a verdict for the plaintiff in an action of ejectment. Affirmed.

The facts as they appeared at the trial before MORROW, J., were as follows:

In the construction of the Upper North Branch Division of the Pennsylvania canal in Athens township, Bradford county,

the line of the canal passed through certain land of John Spalding, and the west end of a dam built across the Chemung or Tioga river, for the purpose of feeding the canal with water, was built upon said land, as well as a lock.   This dam was one of the largest and most important works of the state, appurtenant to the canal, and its erection consumed a vast amount of timber, earth, and stone, all of which were necessarily obtained from the land in suit, and in fact could not be obtained elsewhere, except at an increased and unwarranted expense.   The same materials were in constant demand for the maintenance and repair of the dam, and the amount of land required to furnish the necessary material, not only for the construction of the dam, the lock, and the canal, but also constantly needed for their maintenance, could alone be determined by the commissioners.

February 25, 1826, P. L. 55, the legislature provided for the commencement of the "Pennsylvania canal;" and §§ 7 and 8 of said act, P. L. 57, authorized the purchase of lands, and provided the mode of procedure in ascertaining damages, etc.

April 9, 1827, P. L. 192, the legislature provided for the further extension of the Pennsylvania canal, and by the same act, pp. 197, 198 (where private property may be in a great measure destroyed by the public works, and when in the opinion of the commissioners it would be more advantageous to purchase the land than pay the probable amount of an assessment of damages), said commissioners were authorized to purchase such lands on behalf of the state, and to sell the remainder not occupied by the canal, and convey to the purchasers respectively the estate and title thus acquired.

September 25, 1838, the canal commissioners, being of the opinion that the erection of the dam and canal materially injured the farm of John Spalding, so as to destroy it for farming purposes, voted to pay said Spalding $4,000, in full compensation for all damages by the building of said dam and canal, and as full pay and consideration of the purchase money of said Spalding's farm or tract of land through which said canal passes (including all that farm and land connected with it), upon said Spalding's conveying said farm to the commonwealth in fee simple.

September 18, 1839, John Spalding conveyed to the commonwealth the said land, being 72 acres and 130 perches, more or

less, by deed, which was recorded in Bradford county, January 31, 1840, in Deed Book No. 16, p. 348.

Under the authority of the act of 1858, P. L. 414, the Upper North Branch Division of the Pennsylvania canal, *inter alia,* was sold to the Sunbury & Erie Railroad Company, with all the property thereto belonging, or in any wise appertaining, and all the estate, right, title, and interest of the commonwealth therein, the deed for which, dated May 19, 1858 (that was made by the governor in pursuance of the act), has since been lost. May 19, 1858, the governor made proclamation, in pursuance of the sale of all the property.

May 25, 1858, the governor assented to the sale by the Sunbury & Erie Railroad Company to the North Branch Canal Company, of that part of the canal, *inter alia,* beginning at the line of the state of New York, in the county of Bradford, and thence down through the said county of Bradford, etc., embracing the land in question.

May 25, 1858, the Sunbury & Erie Railroad Company made deed to the North Branch Canal Company, which was recorded in Bradford county, June 8, 1875.

April 12, 1859, P. L. 530, the legislature passed an act for the assessment and recovery of damages upon the Upper North Branch (and Wyoming) canal.

March 20, 1865, P. L. 427, the legislature authorized the North Branch Canal Company to change their name, style, and title to the Pennsylvania & New York Canal & Railroad Company, and to construct a railroad along and upon or near the towing path or berme bank of its canal. The railroad was constructed, and continues to be operated.

This action was begun by the said Pennsylvania & New York Canal & Railroad Company, against N. C. Harris and others in possession. The defendants, having no paper title, relied entirely on their possession.

The court below charged the jury as follows:

This is an action of ejectment brought by the Pennsylvania & New York Canal & Railroad Company against N. C. Harris and A. C. Elsbree, to recover a lot of land in Athens township, containing 72 acres and 130 perches. The land is on the west of the Chemung river,—the dam that was built across the river when the North Branch coal was constructed abutted against

this land.    From the river it extends west, over a high hill. It is a narrow strip, about one mile long.

After the suit was brought, the defendants disclaimed any right, title, or possession to all that part of the land lying east of a certain dug road that crossed it along the side hill.    This piece contained 39 acres and 61 perches.    They are in possession of all the land (33 acres and 69 perches) lying west of the dug road, and claim to hold it as against the plaintiff.

In the construction of the North Branch canal, a dam was constructed across the river at Athens, and the west end of it abutted against the land of John Spalding.    The canal commissioners, under authority of law, purchased Spalding's land December 18, 1839, for $4,000, in pursuance of a resolution to that effect adopted September 25, 1838.    The deed is to the commonwealth of Pennsylvania and bears date December 18, 1839, and covers the land in dispute.

In pursuance of an act of assembly, the state canals were sold, and the title to the North Branch canal became vested in the North Branch Canal Company, May 19, 1858.    In 1865 this company's name was changed to the Pennsylvania & New York Canal & Railroad Company, and was authorized to construct a railroad along, upon, or near the towing path or berme bank. The road was constructed and passes through the land in suit some little west of the Chemung river, and west of the canal.

The plaintiff claims that all of the Spalding farm passed to it under the sale of the state canals, for the reason that it was appurtenant to and part of the canal.

The defendants claim that it was not appurtenant nor necessary to operate the canal.    They have given no evidence.    Their possession is sufficient to protect them, and there can be no recovery here until the plaintiff has shown a better title.    This depends upon the construction of the acts of assembly under which the canals were sold.    They provide that the sale shall convey all the property appurtenant to the canal or in any wise appertaining thereto, and all the estate, right, title, and interest of the commonwealth in and to the same,—and all claim and demand whatsoever, etc.

[The defendants ask us to submit to you whether this land was necessary for the use of the canal,—that is, the 33 acres and 69 perches.    This we refuse to do, and say our opinion is, under

the evidence, and the acts referred to, the plaintiff is entitled to recover.]

This affirms the plaintiff's points, and denies the points of the defendants.

Verdict and judgment were for the plaintiff.

The assignments of error specified, *inter alia,* the portion of the charge inclosed in brackets.

*Edward Overton, Jr.,* and *John F. Sanderson,* for plaintiffs in error.—The plaintiff was never in possession of the land in controversy, and it was therefore incumbent on it to show a good title thereto in order to recover against the defendants who are in possession. Shumway v. Phillips, 22 Pa. 151.

The lot in controversy was not purchased for canal purposes, but under the act of 1827, which expressly authorized the purchase for the state of lands not required for the canal, when a portion of them had been destroyed by the public works. In the case of the Plymouth R. Co. v. Colwell, 39 Pa. 339, 80 Am. Dec. 322, it was said: "They [the company] had very express authority by the incorporating law to buy, hold, mortgage, and sell lands; and in locating their road they probably found it expedient to buy the Lukens farm rather than pay damages for crossing it. This is often the true policy of railroad companies. But lands so bought and not actually dedicated to corporate purposes are bound by the lien of judgments," etc.

The act of 1858 authorized the sale of the public works but not the sale of any other property belonging to the state.

A contract between the commonwealth and a private person is ordinarily to be construed in the same manner as a like contract between natural persons. Com. *ex rel.* Cass v. Pennsylvania R. Co. 51 Pa. 351.

The title of the plaintiff extends only to such lands actually and permanently occupied by the state for canal purposes. Western Pennsylvania R. Co. v. Sharp, 26 Pittsb. L. J. 129.

"Any ambiguity in the grant must be construed against the corporation in favor of the public." Northern Liberties v. Northern Liberties Gas Co. 12 Pa. 321.

While the rule is that "the words of an instrument shall be taken most strongly against the party employing them," yet "where a question arises on the construction of a grant from the

Crown, the rule under consideration is reversed, for such grant is construed most strictly against the grantee, . . . so that nothing will pass to the grantee but by clear and express words. Broom, Legal Maxims, 260.

The land was clearly no part of the North Branch canal. When it was purchased by the state the canal board put upon record their reasons for purchasing it. They deemed it to the advantage of the commonwealth to buy a farm, the portion of which lying on the flats had been injured, and which might be utilized for a water power, rather than pay damages to the owner. The part now in controversy could by no possibility be used in connection with the canal. It was several hundred feet higher than the canal and more than half a mile from it. "What is necessary to the enjoyment of the thing devised passes with it as an appurtenant without express words, but what is merely convenient does not." Howell v. M'Coy, 3 Rawle, 256.

This land was not necessary to the enjoyment of the canal.

"Town lots held by a railroad company do not pass by a sheriff's sale upon a mortgage of the road 'with its corporate privileges and appurtenances,' unless directly appurtenant to the railroad and indispensably necessary to the enjoyment of its franchises." Shamokin Valley R. Co. v. Livermore, 47 Pa. 465, 86 Am. Dec. 552.

It is only such property belonging to corporations as is appurtenant and indispensable to its construction, and fitting it for use, that can claim to be exempt from taxation. Railroad v. Berks County, 6 Pa. 70.

Town lots owned by the corporation are no part of the railroad. Youngman v. Elmira & W. R. Co. 65 Pa. 278.

The report of viewers must show that the land taken is necessary for railroad purposes. O'Hara v. Pennsylvania R. Co. 25 Pa. 445.

*Davies & Hall* and *Henry Streeter,* for defendant in error.— This land was purchased by the canal commissioners under the act of February 25, 1826, P. L. 57, as follows: "That it shall and may be lawful for the said board, or a majority of them, to agree with the owner or owners of any land through which the said canal is intended to pass, for the purchase, use, and occupation thereof, on behalf of the state."

The land was not purchased under the act of April 9, 1827,

P. L. 198, which expressly stated that "nothing therein contained shall be construed as limiting the powers already granted to the canal commissioners for the purchase of lands through which the canal was expected to pass." The land was wholly destroyed for farming purposes in the opinion of the commissioners.

But even if the land in question had been purchased under the act of 1827, this would not materially affect the title of the defendant in error to these lands. It is true the canal commissioners had the right to sell such portions of the land so purchased as they might think unnecessary for the canal. But they, and they only, had this right and this discretion. They never did sell any of these lands, and the right to so sell or part with them under the act of 1827 ended with the expiration of their powers. And from their not having sold any of this land, under the authority of that act, it should be presumed that they considered it all necessary for the convenient use and occupation of the canal.

The action of the canal commissioners was conclusive of the question as to the amount of land necessary for the convenient use of the canal. The time to dispute their discretion was before them, in the way pointed out by the act of assembly creating the board.

It was not for the appraisers of damages to determine that the commonwealth should take less than a fee, nor even what should be the duration of interest in what was taken for temporary use. This was to be determined by the board of canal commissioners. It was what was required by the board for the use of the state that they were to value and describe; and it was of that thus required and described, not of that which the viewers might think necessary, that the law defined the seisin of the state. Haldeman v. Pennsylvania C. R. Co. 50 Pa. 425.

The question, Who has authority to judge of such encroachments, the canal commissioners or the jury?—is begged when it is left to the jury to say whether the canal commissioners act arbitrarily or not. Downing v. McFadden, 18 Pa. 337. See also Ridge Turnp. Co. v. Stoever, 6 Watts & S. 378.

The extent of the transfer to the defendant in error is to be determined by the act of assembly authorizing the sale, and the governor's proclamation showing what was sold and transferred.

There is no ambiguity in either the act of assembly or the

proclamation; and therefore the cases cited by counsel, that grants are to be construed in favor of the commonwealth, are not applicable.

The construction of this act of assembly is for the court, and not for the jury; but the court in construing it must look into the circumstances under which it was made, as evidencing the intention of the parties.   Cox v. Freedley, 33 Pa. 124, 75 Am. Dec. 584.

In order to interpret this act of assembly and this proclamation and give each clause in them its full meaning, we must look at things as they then existed, and the canal as it then was. To give a particular description was impossible.   The canal property was over 100 miles long.   Its boundaries were irregular.   In some places its title extended only so far as its permanent monuments had been built on the ground.   In others the title extended as far as the descriptions contained in deeds and releases, which had been placed on record.   The property varied in width from about sixty feet, when it passed through flat and level land, to that of many rods when it passed through deep cuts or along steep hillsides.   Besides this, there were many pieces of land used in connection with toll houses, lock houses, weigh locks, basins, docks, besides lands overflowed by the back water from the dams, necessary for the convenient use of the canal, of different sizes, irregular shapes, in some cases with undefined or perhaps undefinable boundaries.   As these pieces of land could not be particularly described, it was necessary to convey them by general words, and we claim that those used in the act are the most general and sweeping that could have been selected.

The property is to be conveyed with the appurtenances.   Later cases have modified the rule stated in Howell v. M'Coy, 3 Rawle, 256, as to what will pass under the term "appurtenances."

Appurtenances do not pass alone on the ground of absolute necessity, as some of the more ancient cases seem to show, or on the principles governing right of way, of necessity.   One general test is how far the incidents claimed are necessary for the reasonable enjoyment of what is expressly granted.   Wright v. Chestnut Hill Iron Ore Co. 45 Pa. 482; Buckholder v. Sigler, 7 Watts & S. 154; Grubb v. Guilford, 4 Watts, 223, 28 Am. Dec. 700; Grubb v. Grubb, 74 Pa. 33.

The construction of the dam would consume a vast amount of

earth, stones, timber, and other materials, and for its mainte-
nance and repairs the same would be constantly needed.    A
piece of land from which these materials could from time to time
be obtained would be necessary for the convenient and econom-
ical use and maintenance of the canal at this point.

By the act of assembly, all the property of the state in the
said public works was to be conveyed.    Property signifies every
species of property; it is *nomen generalissimum,* and compre-
hends all his earthly possessions.    It is equivalent to a disposi-
tion of all I am worth in the world; whatever else I am worth in
the world; whatever else I have in the world; all my substance;
which has been construed not only to pass lands but to pass the
fee simple.    Rossetter v. Simmons, 6 Serg. & R. 456; Stoever
v. Stoever, 9 Serg. & R. 445; Foster v. Stewart, 18 Pa. 23–25;
Morrison v. Semple, 6 Binn. 98.

But even the word "property" was not considered strong
enough to describe all that the grantors intended to convey; and
it is mentioned as "property thereto belonging, or in any wise
appertaining."    Webster defines the word "appertain:" "to be-
long to, whether by right, nature, or appointment."

The commonwealth alone can object to a want of capacity in
a corporation to hold lands which it was not authorized to pur-
chase.    It takes and conveys to its alienee a defeasible title.
Leazure v. Hillegas, 7 Serg. & R. 313; Goundie v. Northampton
Water Co. 7 Pa. 233.

OPINION BY MR. JUSTICE GORDON:

The case before us involves nothing of material consequence,
and might well be affirmed, with little or no discussion.    It is
admitted that the defendants have no title whatever to the land
described in the writ.    If it belongs not to the plaintiff, then it
does belong to the commonwealth of Pennsylvania; and although
it may belong to the latter, yet it is not now and never was open
to settlement, warrant, or patent; nor is it property over which
the land office has ever had jurisdiction.

The defendants rest their defense solely on the ground of
possession, a ground sufficiently substantial if it be found that
the plaintiff has not a superior right.    It is conceded that the
Pennsylvania & New York Canal & Railroad Company, through
the Sunbury & Erie Railroad Company, and the North Branch
Canal Company, was and is the vendee of the commonwealth as

to all the property belonging or appurtenant to the North Branch canal; but it is alleged that the land in suit was not so appurtenant, and this because it was not necessary for the use of that improvement; hence, although the grant to the company above named was, "of the upper North Branch canal, with all the property thereto belonging, or in any wise appertaining," it did not convey the land in controversy. That is, as the defendants contend, although this whole tract of 72 acres was bought by the canal commissioners for the use of the canal, and on part of which the canal was actually located, they have nevertheless the right to define what was necessary for that purpose; to run off what they may think was really appurtenant to the state works, and settle upon and occupy the balance.

The mere statement of this claim, involving, as it does, an assumption so unwarranted, ought of itself to settle this controversy; for the question naturally presents itself, Who gave these men the authority to say what should or should not be canal property, or to limit the power of the state officers? If the commonwealth treated this as canal property and as such conveyed it to her grantees, we cannot understand by what warrant private citizens undertake to sit in judgment on and annul her acts and the resolutions of her officers. But, passing this feature of the case, let us see how, in fact and in law, this matter stands. By the act of the 25th of February, 1826, P. L. 55, the canal commissioners were authorized "to agree with the owner or owners of any land through which the said canal is intended to pass for the purchase and occupation thereof, on behalf of the state."

Here was the grant of a power certainly of sufficient breadth and generality; their purchases were to be confined to lands through which the canal was intended to pass, but there was no limitation either as to amount or quality; that was left to their sole discretion. They might be extravagant to the last degree; they might buy 100 acres where but ten were necessary, but there was no power which could call them to account, or reverse their judgment, except that by which they were created,—the general assembly of the commonwealth.

Again, if they did so purchase, under the provisions of the said act, whether economically or extravagantly, the land so purchased was canal land—appurtenant to the canal, for they had no power to purchase for any other purpose. The land office had nothing to do with it, nor was any department of the gov-

ernment authorized to sell or otherwise dispose of it. Hence, but for § 16 of the act of the 9th of April, 1827 (P. L. 201), lands so purchased must have remained canal property as long as the state retained its improvements.

In such case, however, that is, had neither that act nor one similar to it been passed, it is very clear that all the property purchased by the commissioners under the acts of 1826 and 1827 would have to be regarded as belonging to the public works; and in case of the sale of those works and their appurtenances, all such property must pass and be held by the commonwealth's vendee. But the latter act put no compulsion on the commissioners; authority was thereby given to them "to sell the remainder not occupied by the canal, and to convey to the purchasers respectively the estate and title thus acquired;" but whether they should make such sale or not was left entirely to their own discretion.

We have, then, in this department of the commonwealth (called the "Board of Canal Commissioners," which said board represented the public works and nothing else), the power to purchase lands for the use of the state canals and for no other purpose; the power also to sell them, should it seem to that board necessary; so, from this, it would seem to follow as a corollary that the judgment of this board must be final, since there was no tribunal in the state having power to revise that judgment.

If, then, it purchased the land in controversy for the use of the canal, and never declared any part thereof unnecessary for such use by putting the surplus on the market for sale, by what authority may either a lower court or this court revise and correct the act and judgment, or discretion, of this governmental department, in which was vested all right, title and power in and over the canal lands?

It may be that the canal commissioners acted improvidently in buying the whole of John Spalding's farm for canal purposes when but part of it was necessary for such purposes, or in not running off and selling the surplus, but when we have made this admission, what then? Who can revise and annul their deliberate act? They certainly did need part of it for the use mentioned; and in their resolution of September 25, 1838, they declared that the erection of dam No. 1 so impaired the land of Spalding as to render it unfit for farming purposes; and as the erection of the said dam would create a good water power on said

land, therefore they directed the superintendent of the Tioga line to pay to Spalding the sum of $4,000 for the fee of the whole tract. Thus was the land in controversy bought expressly for the use of the canal by the properly constituted authorities of the state, and it is not within our province to say that they did not act providently.

Did the state still own the canals, the idea that the defendants could squat upon the lands connected with them, and set at defiance the power of the commissioners, on the plea that they were not necessary for the purposes for which they were bought, would be too absurd to talk about. But the plaintiff is the vendee of the state, and by its deed it took that over which the canal commissioners had control for the state; and it now represents both the state and the canal board, so that if the defendants could not claim as against the canal board, prior to the time of the sale, neither can they now claim as against the Pennsylvania & New York Canal & Railroad Company.

The judgment of the court below is affirmed.

Mr. Chief Justice MERCUR and Mr. Justice STERRETT dissent.